**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

_____

IN RE:
JAMES K. HEGARTY,                                    Chapter 7
        DEBTOR                               Case No. 05-30245-WCH
_____

DONALD R. LASSMAN, CHAPTER 7
TRUSTEE,
        PLAINTIFF,
                                                     Adversary Proceeding
v.                                                   No. 06-1148

JAMES K. HEGARTY,
        DEFENDANT.
_____

**MEMORANDUM OF DECISION**

**I. INTRODUCTION**

The matter before the Court is Count V of the Complaint[1] filed by Donald R. Lassman, Chapter 7 Trustee of the estate of James K. Hegarty (the "Trustee"), against James K. Hegarty (the "Defendant" or "Debtor") through which he seeks a determination that the Debtor is not entitled to a discharge pursuant to 11 U.S.C. §§ 727(a)(3) or (a)(4)(D). The Trustee asserts that the Debtor failed to keep and produce or knowingly and fraudulently withheld statements and cancelled checks with respect to two separate bank accounts, and that these documents constitute recorded information from which the Debtor's financial condition might be ascertained. The Debtor argues that his conduct was justified under the circumstances of this case because the Debtor's counsel believed that

---

[1] On October 18, 2007, the parties entered into a Stipulation of Settlement of Certain Claims in Related Adversary Proceedings whereby Counts I through IV of the Complaint were dismissed with prejudice, leaving only Count V to be litigated. *See* Docket No. 52.

there was an understanding with respect to the production of these documents and that the Trustee's subpoena of the Debtor's personal bank records from the bank is not grounds to deny him a discharge. For the reasons set forth below, I will enter judgment in favor of the Debtor.

## II. <u>BACKGROUND</u>

The facts of this case are largely undisputed. The Debtor is a sophisticated business person with considerable experience from several business ventures. Prior to his "semi-retirement" in the mid-1990s, the Debtor served as a bank examiner for the Commonwealth of Massachusetts for approximately ten years, as the chief executive officer of two large nursing homes for approximately eight years, and as a consultant to banks specializing in bank-owned real estate periodically thereafter.[2] Beginning in the mid-1990s, the Debtor moved to Cape Cod and helped his wife, Paula H. Hegarty, operate a "tea room," which was a combination restaurant and gift shop.[3]

From 2000 to 2003, the Debtor operated a credit reporting business as a sole proprietorship (the "Business").[4] In connection with the Business, the Debtor opened a checking account at Compass Bank, which was later transferred to Sovereign Bank (the "DBA Account").[5] The DBA Account was in the name of "James Hegarty d/b/a Credit Reporting Services," and the Debtor was a signatory.[6] In 2003, the Debtor transferred the Business to his daughter for no consideration, and

---

[2] Joint Pre-Trial Statement ("PTS"), Docket No. 104, at ¶¶ 2(3)-(6).

[3] PTS at ¶ 2(7).

[4] *Id.* at ¶ 2(8).

[5] *Id.* at ¶¶ 2(30)-(31). The original account number of the DBA Account ended with 1625, but was later changed to one ending in 9404 when it was acquired by Sovereign Bank.

[6] PTS at ¶¶ 2(32)-(33).

2

she became a signatory on the DBA Account.[7] At trial, the Debtor testified that he believed that this undocumented transfer of control took place in July, 2003.[8] Cancelled checks drawn on the DBA Account indicate, however, that the Debtor continued signing checks until September 30, 2003.[9]

The Debtor testified that the DBA Account statements were originally sent to a post office box in Hyannis, Massachusetts.[10] After the Debtor's daughter assumed the Business, she forwarded the DBA Account statements to a post office box in East Sandwich, Massachusetts.[11] At his deposition in August, 2008, the Debtor stated that he "might have" remained a signatory on the DBA Account, but was unsure as he repeatedly asked his daughter to remove him as a signatory.[12] Ultimately, the DBA Account was closed approximately one year ago.[13]

In 2003, the Debtor was involved in the acquisition of a restaurant located in Bourne, Massachusetts known as Shaw's Fish and Lobster (the "Restaurant").[14] The Restaurant's assets were purchased by the Dunlow Corporation ("Dunlow"),[15] which subsequently filed a bankruptcy petition

---

[7] *Id.* at ¶¶ 2(34)-(35).

[8] Trans. Nov. 14, 2008 at 17, ¶¶ 19-24.

[9] Exhibit No. 22, Check Nos. 102-174.

[10] Trans. Nov. 14, 2008 at 30, ¶¶ 8-15.

[11] *Id.* at 30, ¶¶ 22-23.

[12] PTS at ¶¶ 2(36)-(37).

[13] *Id.* at ¶ 2(38).

[14] *Id.* at ¶ 2(9).

[15] The Debtor became an officer of Dunlow in 2004, and prior to its bankruptcy filing, was the sole officer and director. *Id.* at ¶ 2(11).

3

before this Court on October 26, 2005.[16] The real estate from which the Restaurant operated was purchased by the Hegarty Extended Family Realty Trust (the "Trust").[17] The Trust was created in May, 2003, and at that time the Debtor held a 50% beneficial interest.[18] By July, 2003, however, the Debtor transferred this interest to his wife, Paula Hegarty, who then became the 100% beneficiary.[19] After the acquisition of the Restaurant, the Debtor was in charge of its operations, including maintaining the books and records, paying bills, and managing expenses.[20]

In September, 2003, the Debtor opened an individual checking account at Compass Bank, which was later acquired by Sovereign Bank (the "Individual Account").[21] The Debtor testified that he did not recall having a bank account other than the DBA Account prior to opening the Individual Account.[22] As of August 19, 2008, the Debtor continued to use the Individual Account.[23] Originally, the Individual Account statements were sent to the Restaurant, but were later sent to the Debtor's home.[24] At trial, the Debtor testified that it was not his practice to retain his personal bank

---

[16] *Id.* at ¶ 2(10); *see In re Dunlow Corporation*, Case No. 05-30037-WCH.

[17] *Id.* at ¶ 2(12).

[18] *Id.* at ¶ 2(13).

[19] *Id.* at ¶ 2(14).

[20] *Id.* at ¶¶ 2(16)-(17).

[21] *Id.* at ¶¶ 2(20)-(21). The original account number of the Individual Account ended with 3996, but was later changed to one ending in 2536 when it was transferred to Sovereign Bank.

[22] Trans. Nov. 14, 2008 at 29, ¶¶ 9-17.

[23] PTS at ¶ 2(22).

[24] *Id.* at ¶ 2(23).

statements.[25]  It is undisputed that the Debtor did not have any of the Individual Account statements in his possession at the commencement of this case, and that he did not begin to retain them until sometime in 2007.[26]

The Debtor filed his Chapter 7 petition on December 20, 2005.[27]  At that time, the Debtor was represented by Attorney Shaun Ellis ("Attorney Ellis").  On Schedule B - Personal Property ("Schedule B"), the Debtor indicated that he had a checking account but did not identify the account number or bank at which it was maintained.[28]  At his deposition, the Debtor testified that the checking account referenced on Schedule B was the Individual Account.[29]  The Debtor further testified at trial that he assumed that Attorney Ellis would have instructed him to include the account number and name of the bank on Schedule B if it had been necessary.[30]  At trial, the Debtor explained that his failure to list the DBA Account was due to his belief that he no longer had an interest in the account as a result of transferring the business and the DBA Account to his daughter two years earlier.[31]

The Trustee filed the present adversary proceeding on February 21, 2006.  Through his five

---

[25] Trans. Nov. 14, 2008 at 11, ¶¶ 3-11; *see also* PTS at ¶ 2(26).

[26] PTS at ¶¶ 2(24), (28).

[27] *Id.* at ¶ 2(1).

[28] *Id.* at ¶ 2(18); Exhibit No. 15.

[29] *Id.* at ¶ 2(19).

[30] Trans. Nov. 14, 2008 at 22, ¶¶ 4-9.

[31] *Id.* at 20, ¶¶ 21-25, 21, ¶¶ 1-5.  Notably, neither the Business nor the DBA Account were listed on the Statement of Financial Affairs.  See Exhibit No. 15.  This issue, however, was not raised prior to trial and is waived.

count Complaint, the Trustee sought to avoid the Debtor's transfer of his 50% interest in the Trust, recover damages from the Debtor and Paula Hegarty (collectively, the "Defendants") for alleged fraudulent conduct, enjoin the Paula Hegarty from transferring any interest in proceeds from a sale of trust property, and to deny the Debtor a discharge under 11 U.S.C. § 727. On March 31, 2006, Attorney Gary W. Cruickshank ("Attorney Cruikshank") filed a notice of appearance as successor counsel to the Debtor. On the same date, Attorney Ellis filed a Motion to Withdraw as Debtor's Counsel, which was subsequently granted on April 11, 2006.

As is clear from both the docket in this adversary proceeding and the evidence introduced at trial, the parties engaged in a lengthy informal discovery process with an eye towards settlement. Between May and August, 2006, Attorney Cruikshank and Attorney Taylor A. Greene ("Attorney Greene"), then counsel to the Trustee, exchanged numerous correspondence with respect to the status of the Defendants' production of documents relating both to their personal finances and the Trust. The Trustee does not dispute that the Defendants have produced non-personal bank records and other documents pertaining to the purchase of the Restaurant's assets by the Trust and Dunlow.[32]

By a letter dated May 26, 2006, addressed to Attorney Cruickshank, Attorney Greene expressly requested "all 'bank account statements and cancelled checks for the period January 2001 to February 15, 2006 for *all financial accounts of any kind* maintained by (1) the Debtor . . . .'"[33] He renewed this request by a letter dated June 15, 2006, stating in relevant part:

> Despite our numerous discussions, my letters of May 9, 2006 and May 26, 2006, assurances from your clients and the Bankruptcy Court's February 27, 2006 order (which required that your clients produce certain documents by March 9, 2006), your clients have still failed to produce, among other documents:

---

[32] PTS at ¶ 2(40).

[33] Exhibit No. 3 (emphasis in original).

6

* * *

- Cancelled checks and bank statements for James Hegarty's individual accounts;

* * *

We understand from [Attorney Cruikshank] that James Hegarty asserts that he does not keep but discards the monthly bank statements and checks he receives related to his personal accounts. Even if this is true, he can obtain copies of these checks and statement from his bank(s) and produce them to us. Please confirm in writing whether he has in fact disposed of the originals and whether he will produce copies obtained from the bank(s). Please identify the banks and account numbers of any such individual accounts.[34]

It appears that Attorney Cruickshank first responded to Attorney Greene's letter indirectly by copying him on a letter to the Office of the United States Trustee in which he stated, "Mr. Hegarty does not keep his bank statements but will order them from his bank."[35] Then, on June 28, 2006, Attorney Cruickshank wrote to Attorney Greene directly, stating that "Mr. Hegarty confirms that he does not retain his bank statements and any deficiencies in the prior production request could be sought from third party banks."[36]

On August 28, 2006, Attorney Cruickshank made a written inquiry to Attorney Peter Rosa ("Attorney Rosa"), counsel to Sovereign Bank, with respect to obtaining copies of the Individual Account's bank statements.[37] Attorney Greene was copied on this correspondence.[38] Attorney Rosa

---

[34] Exhibit No. 5.

[35] Exhibit No. 7.

[36] PTS at ¶ 2(27); Exhibit 8.

[37] Exhibit Nos. 11 and 12. Curiously, this initial communication only references the United States Trustee's request for the Individual Account's statements for the months June through December, 2005.

[38] *Id.*; PTS at ¶ 2(39).

responded via email that same day, informing him that his request had been forwarded to the documentation unit and would be processed as soon as they received the Debtor's signed authorization.[39] In Attorney Cruickshank's Affidavit, he avers that he has no record or recollection as to whether the Debtor provided the signed authorization to his office or whether he neglected to forward it to Sovereign Bank.[40]

This matter apparently was dormant until August, 2007, when successor counsel for the Trustee, Attorney David M. Souza ("Attorney Souza") emailed a renewed request for the Debtor's personal banking records to Attorney Cruickshank.[41] After receiving the Individual Account's account number and location, Attorney Souza sent another email to Attorney Cruickshank stating:

> [Attorney Cruickshank], please ask your client if his Sovereign Bank records are available to him. If so, I need a copy of them. If not, I'll subpoena the bank.

Attorney Cruickshank forwarded this email to the Debtor, who responded as follows:

> [H]i [Attorney Cruickshank], I believe that your office had requested soveign [sic] bank to forward those records to you a while back. [O]ne of the trustees requested them may be [sic] a year ago, if unavailable I will send for them again but [I] need to know what time period they are looking for , thanks again jim[42]

In a subsequent email, Attorney Souza specifically identified the documents between the Debtor and Sovereign Bank that he required.[43] Attorney Cruickshank forwarded the Debtor's response to Attorney Souza and with a note stating that "[i]t may be just as easy to subpoena what you want."

---

[39] Exhibit No. 12.

[40] Exhibit No. 14, ¶ 5.

[41] Exhibit No. 13.

[42] *Id.*

[43] *Id.*

8

A few hours later, Attorney Cruickshank sent the following email to Attorney Souza:

> Hi David;
>
> I am out of the office next week on vacation until September 4, 2007. Is it ok to review this request upon my return? My file is quite voluminous.
>
> Regards,
> Gary[44]

Attorney Souza then sent the following response shortly thereafter:

> Gary, sorry I missed your call, thank you for your message. I will review my files again, but given that [Attorney Greene] already reviewed the documents and your impression of what you have (or did have), I will likely subpoena the bank.
>
> Enjoy your vacation,
>
> Dave[45]

In his affidavit, Attorney Cruickshank summarized his understanding at that time regarding the production of the Debtor's personal bank records:

> 9. I would have followed up with the Sovereign Bank statements upon my return from vacation but Counsel to the Trustee had, in my opinion, indicated he would subpoena these documents because of my vacation.
>
> * * *
>
> 11. Based upon that email in late August of 2007, I felt that there was a cooperative effort to obtain the Sovereign Bank statements and I did not believe any further action on my part was required.[46]

On August 30, 2007, the Trustee filed a Motion for Order Authorizing Issuance of a Subpoena seeking to obtain bank account records from Sovereign Bank. I granted the motion on

---

[44] *Id.*

[45] *Id.*

[46] Exhibit No. 14, ¶¶ 9, 11.

9

September 11, 2007, and Attorney Souza served the subpoena on Sovereign Bank by Deputy Sheriff on September 28, 2007.[47] As a result of the subpoena, the Trustee obtained copies of the account statements and cancelled checks for both the Individual Account and the DBA Account.

Nearly two months later, on October 18, 2007, the parties entered into a Stipulation of Settlement of Certain Claims in Related Adversary Proceedings whereby Counts I through IV of the Complaint were dismissed with prejudice. I approved the stipulation on November 29, 2007. The Trustee, however, continued to seek denial of the Debtor's discharge under Count V of the Complaint on the basis that he failed to keep or concealed documentation from which the Trustee might ascertain his financial condition.

After several more months of discovery, I conducted a trial on the matter on November 14, 2008. At trial, the parties introduced twenty-four[48] joint exhibits consisting primarily of correspondence between the parties and account statements and cancelled checks for both the Individual Account and the DBA Account (collectively, "the Bank Records"). The Debtor was the only witness, and he testified that it has always been his practice to discard his personal bank statements. He also testified that it was his understanding that his counsel would obtain copies from Sovereign Bank to satisfy the Trustee's request.[49] The Debtor conceded, however, that as of December, 2005, the Individual Account statements and cancelled checks were the only documents from which a person could have determined his financial condition.[50] At the conclusion of the trial,

---

[47] Exhibit No. 16.

[48] I overruled the Trustee's hearsay objection to the admission of Attorney Cruickshank's affidavit, Exhibit No. 14.

[49] Trans. Nov. 13, 2008 at 11, ¶¶ 14-19.

[50] *Id.* at 35, ¶¶ 13-25; 36, ¶¶ 1-25.

I took the matter under advisement, and the parties filed post-trial briefs.

### III. POSITIONS OF THE PARTIES

    A. The Trustee

The Trustee asserts that it is undisputed that the Debtor discarded the Bank Records, and that the Bank Records are recorded information from which the debtor's financial condition might be ascertained. As such, the Trustee contends that the Debtor cannot carry his burden of proving that his conduct was justified under all the circumstances of this case. First, the United States Court of Appeals for the First Circuit has held that complete disclosure of even de minis accounts is a condition precedent to the granting of a discharge.[51] Second, the Trustee argues that failure to maintain financial records is only justified in unusual circumstances and that numerous courts have rejected defenses based upon a debtor's common practice not to retain financial records.[52] Third, the Trustee asserts that his subpoena of the Bank Records from Sovereign Bank is irrelevant because "the burden is not on the [Trustee] to organize and reconstruct the debtor's business affairs."[53] The Trustee relies on *In re Self*[54] for the proposition that the ability to obtain financial records via subpoena from various financial institutions does not relieve the Debtor of his duty to produce these records.

---

[51] *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 68 (1st Cir. 2004).

[52] *See Katz v. Kurtaj (In re Kurtaj)*, 284 B.R. 528, 531 (Bankr. D. Conn. 2002); *Casa Investments Co. v. Brenes (In re Brenes)*, 261 B.R. 322, 333 (Bankr. D. Conn. 2001); *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993);

[53] *Matter of Juzwiak*, 89 F.3d 424, 429 (7th Cir. 1996).

[54] *Structured Asset Servs., LLC v. Self (In re Self)*, 325 B.R. 224, 244 (Bankr. N.D. Ill. 2005).

B. The Debtor

The Debtor asserts that his discharge should not be denied because he discarded the Bank Records pursuant to his common practice and not in an effort to prevent the Trustee from determining his financial condition. Relying on *In re Keefe*,[55] the Debtor infers that because the the discarded Bank Records could be, and in fact were, easily subpoenaed from Sovereign Bank, they were not "concealed" or "destroyed" within the meaning of 11 U.S.C. § 727. Moreover, the Debtor argues that under the circumstances of this case, denial of discharge is not warranted because the Trustee subpoenaed and obtained the Bank Records. The Debtor asserts that in light of the correspondence between Attorney Cruickshank and Trustee's counsel, the Trustee was not forced to subpoena the Bank Records, but did so in the context of ongoing cooperative discovery after the request had been "placed on the backburner."

With respect to the DBA Account, the Debtor argues that it was not disclosed on his schedules because he had transferred the business, including the DBA Account, to his daughter two years prior to his bankruptcy filing and believed that the name on the account had been changed.[56] Moreover, because the DBA Account statements were sent to a post office box to which he did not have access, the Debtor contends he was justified in not having them in his possession.

IV. DISCUSSION

Section 727(a) of the Bankruptcy Code sets forth conduct that can preclude a debtor from

---

[55] *Lassman v. Keefe (In re Keefe)*, 380 B.R. 116 (Bankr. D. Mass. 2007).

[56] This argument appears to respond to an allegation that the Debtor made a false oath or account under 11 U.S.C. § 727(a)(4)(A). This issue was not included in the Joint Pre-Trial Statement and was not raised at trial. As the pre-trial order provides that the Joint Pre-Trial Statement supercedes all prior pleadings and governs the course of trial, the Trustee waived any argument under 11 U.S.C. § 727(a)(4)(A).

12

receiving a discharge in bankruptcy.[57] "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy."[58]

A. Denial of Discharge Under 11 U.S.C. § 727(a)(3)

Section 727(a)(3) of the Bankruptcy Code provides in relevant part:

(a) The court shall grant the debtor a discharge, unless–

\* \* \*

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;[59]

The purpose of this provision is "to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge."[60] The Bankruptcy Code does not "require an impeccable system of bookkeeping," but merely records that "sufficiently identify the transactions [so] that intelligent inquiry can be made of them."[61]

Under 11 U.S.C. § 727(a)(3), "[t]he initial burden is on the party objecting to discharge to prove two things: (i) that the debtor 'concealed, destroyed, mutilated, falsified, or failed to keep or

---

[57] *In re Schifano*, 378 F.3d at 66.

[58] *Palmacci v. Umpierrez (In re Umpierrez)*, 121 F.3d 781, 786 (1st Cir. 1997).

[59] 11 U.S.C. § 727(a)(3).

[60] *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) (citing 4 Collier on Bankruptcy ¶ 727.-03[1] (15th ed. 1979)).

[61] *In re Schifano*, 378 F.3d at 69 (*quoting Meridian Bank*, 958 F.2d at 1230).

preserve any recorded information;' and (ii) that the recorded information was information 'from which the debtor's financial condition or business transactions might be ascertained.'"[62] The objecting party need not establish specific intent of any kind.[63] Once the objecting party has proven these two elements, the burden shifts to the debtor to demonstrate that such act or failure to act was justified under the circumstances of the case.[64]

In the present case, it is undisputed that the Debtor routinely discarded his personal bank statements prior to 2007. The Debtor also conceded that on December 20, 2005, the Individual Account statements and cancelled checks were the only documents from which a person could have ascertained his financial condition. In order to determine whether the Trustee has met his burden, it is necessary to first consider the nature and significance of the act of discarding bank statements under these circumstances.

It is clear that the Debtor neither "mutilated" nor "falsified" any recorded information by discarding the Bank Records. Despite the Debtor's initial failure to disclose the Individual Account number and bank at which it was maintained in Schedule B, "concealed" is an equally erroneous characterization. The Debtor credibly testified that this omission was due to ignorance of such a requirement, and it is illogical to conclude that he intended to conceal an asset listed in his schedules. Further, if the Trustee has determined that the Debtor's description of the account was deficient, he could have requested him to amend the schedule. While "destroyed" may have a superficial appeal, it is undercut by the reality that the Bank Records were not only obtained by the Trustee, but

---

[62] *In re Keefe*, 380 B.R. at 120 (*quoting* 11 U.S.C. § 727(a)(3)).

[63] *Id.*

[64] *In re Schifano*, 378 F.3d at 71; *Campana v. Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (B.A.P. 1st Cir. 2000).

presented to the Court as trial exhibits.[65]

The final acts contemplated by the statute are the failure "to keep or preserve" any recorded information.  In his brief, the Trustee asserts that the Debtor failed to "keep and produce" his personal statements.  While the word "keep" is commonly understood to mean, *inter alia*, "to retain,"[66] courts have held that in the context of 11 U.S.C. § 727(a)(3), the word "keep" means "to maintain a record by entering it in a book" because, under the rules of statutory construction, it cannot be synonymous with "preserve."[67]  While not all courts have used this language with such specificity,[68] I nonetheless find that by failing to retain the Bank Records in his possession, the Debtor failed "to preserve" recorded information from which his financial condition might have been ascertained within the meaning of the statute.  Accordingly, the burden shifts to the Debtor to demonstrate that his actions were justified under all circumstances of this case.

Whether a failure to preserve records is justified is a question of fact to be determined under

---

[65] While I do not find that documents maintained by third parties can never be "destroyed" for purposes of 11 U.S.C. § 727(a)(3) so long as a copy is available, such a characterization here, where the documents in question have been recovered and introduced into evidence, is inappropriate.  Even if "destroyed" was the correct characterization, the documents' recovery would likely justify their prior destruction.  *See In re Keefe*, 380 B.R. at 121 ("If the records could be recovered easily and without much cost, perhaps their destruction would be deemed justified in the sense that the destruction was inconsequential.").

[66] *The American College Dictionary* 668 (1970).

[67] *See Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999); *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 833 (Bankr. D. Ohio 2004); *Volpe v. McDonough (In re Volpe)*, 317 B.R. 684, 690 (Bankr. D.S.C. 2003); *In re Brenes*, 261 B.R. at 330 n.9.

[68] *See, e.g., In re Kurtaj*, 284 B.R. at 531 (financial records were not kept because it was the debtor's routine practice to destroy them).

all the particular circumstances of the case.[69] "An act is justified if it is right or appropriate in the circumstances."[70] A valid justification may arise where a combination of factors led to the failure to preserve records.[71] Among the relevant circumstances to be considered is the education and sophistication of the debtor.[72] Additionally, in *In re Keefe*, Judge Somma suggested, albeit in dicta, that if records could be recovered easily and without much cost, their loss would be deemed justified in the sense that the loss was inconsequential.[73]

In the present case, the Debtor routinely discarded his personal bank statements prior to 2007 simply because that was his practice. Routine practice, by itself, however, is insufficient justification to avoid denial of discharge because it would render the rule meaningless.[74] The Debtor, through his involvement with numerous business ventures and work as a bank examiner and consultant, is clearly sophisticated, and normally, a sophisticated debtor faces a greater burden to demonstrate that his failure to preserve recorded information was justified. Here, however, the Debtor's sophistication and experience bolster his claim of justification. The trial testimony and evidence before me indicate that the Debtor was well aware that copies of his personal bank statements could

---

[69] *Cohen Steel Supply, Inc. v. Fagnant*, No. 03-10496-JMD, 2005 WL 1244866 (Bankr. D.N.H. Apr. 14, 2005) *aff'd*, 337 B.R. 729 (B.A.P. 1st Cir. Feb. 9, 2006).

[70] *In re Keefe*, 380 B.R. at 121.

[71] *Oochs v. Nemes (In re Nemes)*, 323 B.R. 316, 327 (Bankr. E.D.N.Y. 2005); *In re Devaul*, 318 B.R. at 838.

[72] *In re Schifano*, 378 F.3d at 68.

[73] *In re Keefe*, 380 B.R. at 121; *cf. Wortman v. Ridley (In re Ridley)*, 115 B.R. 731, 735 (Bankr. D. Mass. 1990) (reconstruction of debtor's records based on accountant's estimates of business activities is insufficient).

[74] *In re Kurtaj*, 284 B.R. at 531.

be obtained from Sovereign Bank if needed. Moreover, the fact that they ultimately were obtained by the Trustee demonstrates that the Debtor's failure to preserve the Bank Records was inconsequential. There is, of course, one problem: the Debtor did not obtain the Bank Records *himself*.

Courts uniformly recognize that 11 U.S.C. § 727(a)(3) does not place the burden on the objecting party to organize and reconstruct the debtor's business affairs.[75] In *In re Self*, the debtor produced few financial records to explain the loss of over $252,095.90, but argued that the objecting creditor could simply have obtained the necessary documents from the various financial institutions and the mortgage holder by subpoena.[76] Rejecting this argument, the court denied the debtor a discharge, concluding that it is not the objecting party's burden to produce the debtor's financial records.[77]

The present case, however, is distinguishable from *In re Self* due to the unique facts and circumstances surrounding the discovery process. While the Trustee, and not the Debtor, ultimately obtained the Bank Records, it is not clear from the record that the burden of production inappropriately shifted. The Debtor testified that he understood that Attorney Cruickshank would obtain the Bank Records from Sovereign Bank in response to the Trustee's request. The correspondence in evidence that demonstrates that Attorney Cruickshank contacted Sovereign Bank for that purpose in August, 2006. Although it is unclear why, the issue was not revisited until a year later, as I note that the Trustee offered no evidence indicating continued pursuit of the Bank Records

---

[75] *In re Self*, 325 B.R. at 244; *In re Nemes*, 323 B.R. at 323-324; *In re Volpe*, 317 B.R. at 690.

[76] *In re Self*, 325 B.R. at 244.

[77] *Id.*

17

before Attorney Souza's August, 2007, email. Moreover, the Trustee did not resort to subpoenaing Sovereign Bank until after an ambiguous exchange with Attorney Cruickshank in which he asked to defer the discovery request until his vacation. In response, the Trustee implied that he would obtain the documents directly. Given the informal manner in which the parties proceeded with discovery, Attorney Cruickshank's understanding, or misunderstanding, that Attorney Souza would subpoena the Bank Records to accommodate his impending vacation was not unreasonable. Therefore, under these unique circumstances, I find the Debtor's failure to obtain the Bank Records was justified.

B. <u>Denial of Discharge Under 11 U.S.C. § 727(a)(4)(D)</u>

Section 727(a)(4)(D) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless–

\* \* \*

    (4) the debtor knowingly and fraudulently, in or in connection with
    the case–

\* \* \*

        (D) withheld from an officer of the estate entitled to
        possession under this title, any recorded information,
        including books, documents, records, and papers,
        relating to the debtor's property or financial affairs;[78]

Pursuant to this section, "a debtor has the affirmative duty to surrender to the trustee all recorded information relating to the property of the estate, and is also obligated to cooperate with the trustee by, among other things, providing the trustee with all relevant documents and papers."[79]

---

[78] 11 U.S.C. § 727(a)(4)(D).

[79] *In re Ridley*, 115 B.R. at 736.

> The party objecting to discharge under § 727(a)(4)(D) has the initial burden of proving that: 1) the withholding of documents was done by the debtor or someone for whose conduct the debtor is legally responsible; 2) was in connection with a case; 3) was withheld from an officer of the estate entitled to possession; 4) was done knowingly and fraudulently; and 5) relates to the debtor's property or financial affairs.[80]

Because debtors rarely give direct evidence of fraudulent intent, fraudulent intent can be proven by circumstantial evidence.[81]

In the present case, the Trustee failed to sustain his burden of proof. There is simply no evidence before me from which I can infer fraudulent intent. To the contrary, the testimony and evidence offered at trial indicate that the Debtor intended to produce the Bank Records, but due to Attorney Cruickshank's apparent misunderstanding, did not to do so. To the extent that the Debtor initially failed to disclose the DBA Account, I find that this failure was not occasioned by fraud. Although the Debtor at one time used the DBA Account for personal expenses, the evidence presented reflects that he ceased signing checks from the DBA Account and transferred control to his daughter in September, 2003, over two years prior to the filing of this case. The Debtor credibly testified that he believed that he no longer held an interest in the DBA Account, even though it apparently remained in his name. Moreover, I am unconvinced that the Debtor "withheld" anything, as it is undisputed that the Bank Records were not in his possession. In sum, this claim is merely a reassertion of the Trustee's claim under 11 U.S.C. § 727(a)(3) without regard to its distinct elements.

I note that this matter could have been resolved easily by either party without the need of a trial. The Debtor could have and should have promptly followed up with Sovereign Bank regarding

---

[80] *Olson v. Slocombe (In re Slocombe)*, 344 B.R. 529, 534 (Bankr. W.D. Mich. 2006).

[81] *See Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994).

the status of his records request when the documents were not produced by the Bank. The Trustee's conduct is even more questionable. If his true aim was to review the Bank Records to assess the Debtor's financial condition, he could have waited for Attorney Cruickshank's return from vacation to address the matter or he could have subpoenaed the Bank Records himself, as he did, and sought sanctions and costs against the Debtor for his time and effort. There is no allegation that the Bank Records ultimately revealed anything untoward, or that they are inadequate to enable the Trustee to ascertain the Debtor's financial condition. Instead, the Trustee used what was essentially an ambiguous discovery dispute as a basis to preserve the sole remaining count in the complaint. This resulted in an unnecessary trial and use of resources.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter judgment in favor of the Debtor on Count V of the Complaint.

_____
William Hillman
United States Bankruptcy Judge

Dated: December 16, 2008